UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

SHAWN L. GARNER,                )
                Petitioner      )
        v.                      )  Civ. No. 04-12636-PBS
                                )
UNITED STATES OF AMERICA,       )
                Respondent.     )
                                )

2005 MAR -2  P 3: 04

U.S. DISTRICT COURT
DISTRICT OF MASS.

## GOVERNMENT'S RESPONSE AND OPPOSITION TO SHAWN L. GARNER'S HABEAS PETITION PURSUANT TO 28 U.S.C. §2255

The United States of America, by and through Assistant United States Attorney Brian T. Kelly, hereby opposes Shawn L. Garner's habeas petition pursuant to 28 U.S.C. § 2255. For the reasons set forth herein, the government requests that the petition be denied without a hearing.

### Procedural Background

On November 2, 2000, petitioner Shawn Garner ("Garner") was indicted by a federal grand jury in the District of Massachusetts on four counts: being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §922(g)(1) (Count One); possessing a firearm with an obliterated serial number, in violation of 18 U.S.C. §922(k) (Count Two); possessing cocaine base with the intent to distribute it, in violation of 21 U.S.C. §841(a)(1) (Count Three); and unlawfully possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. §924(c)(1)(A) (Count Four). Subsequently, at trial, the district court orally granted the government's motion to dismiss

Count Two of the original indictment and Counts Three and Four
were then renumbered as Counts Two and Three for purposes of the
trial.

On December 18, 2001, following a seven-day trial before the
Honorable Patti B. Saris, the jury returned a verdict of guilty
on the remaining three counts of the indictment. The jury also
found that the amount of cocaine base, or "crack cocaine,"
involved in Count Two was 50 grams or more. On April 1, 2002,
Garner was sentenced to 270 months' imprisonment, to be followed
by five years' supervised release.[1]  Garner's subsequent appeal
was denied by the First Circuit. United States v. Garner, 338
F.3d 78 (1st Cir.), cert. denied, 540 U.S. 1084 (2003).

## Section 2255 Review

Section 2255 of Title 28, United States Code, provides in
pertinent part that:

> A prisoner in custody under sentence of a court established
> by Act of Congress claiming the right to be released upon
> the ground that the sentence was imposed in violation of the
> Constitution or laws of the United States, or that the court
> was without jurisdiction to impose such sentence, or that
> the sentence was in excess of the maximum authorized by law,
> or is otherwise subject to collateral attack, may move the
> court which imposed the sentence to vacate, set aside or

---

[1]The Presentence Report ("PSR") had calculated Garner to be
a career offender with a guideline sentencing range ("GSR") of
420 months' to life imprisonment (including the five year "on and
after" sentence for violating 18 U.S.C. §924(c)).  [PSR ¶¶58-59,
69-72, 130].  The district court departed downward from the GSR
on the ground that the career offender designation seriously
overrepresented Garner's actual criminal history, pursuant to
U.S.S.G. §4A1.3.  [4/1/02 Sent. Tr. 9-15, 18].

2

correct the sentence.

28 U.S.C. § 2255.

Section 2255 "provides for post-conviction relief in four instances, namely, if the petitioner's sentence (1) was imposed in violation of the Constitution, or (2) was imposed by a court that lacked jurisdiction, or (3) exceeded the statutory maximum, or (4) was otherwise subject to collateral attack." David v. United States, 134 F.3d 470, 474 (1st Cir. 1998)(citing Hill v. United States, 368 U.S. 424, 426-27 (1962)). The petitioner bears the burden of establishing the need for Section 2255 relief. David v. United States, 134 F.3d at 474.

A petitioner like Garner must establish that his conviction was imposed in violation of the Constitution or laws of the United States involving a "fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inadvertent with the rudimentary demands of fair procedure." Hill, 368 U.S. at 428; United States v. Addonozio, 442 U.S. 178, 185 (1979). To obtain relief under §2255, a petitioner "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). Thus, evidentiary hearings are the rare exception, not the rule. See United States v. McGill, 11 F.3d 233, 225 (1st Cir. 1993); United States v. Mala, 7 F.3d 1058, 1062 (1st Cir. 1993); United States v. Tardiff, 969 F.2d 1283, 1286 (1st Cir. 1992); United

3

States v. DeCologero, 821 F.2d 39, 44 (1st Cir. 1987). A party seeking an evidentiary hearing must carry a fairly heavy burden of demonstrating a need for special treatment. United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993); United States v. Panitz, 907 F.2d 1267, 1273-74 (1st Cir. 1990). Furthermore, the First Circuit has recognized that "in most situations, motions can be 'heard' effectively on the papers, with the parties submitting evidentiary proffers by means of affidavits, documentary exhibits, and the like." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993) (citing Aoude v. Mobil Oil Corp., 862 F.2d 890, 894 (1st Cir. 1988); United States v. DeCologero, 821 F.2d 39, 44 (1st Cir. 1987).

Indeed, the First Circuit has distilled these principles into a rule that holds a hearing to be unnecessary "when a §2255 motion is conclusively refuted as to the alleged facts by the files and records of the case." United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993); Moran v. Hogan, 494 F.2d 1220, 1222 (1st Cir. 1974). In other words, §2255 motions can and should be dismissed without a hearing if the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or if the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact. Carey v. United States, 50 F.3d 1097, 1098 (1st Cir. 1995); Murchu v. United States, 926 F.2d 50,

4

55 (1st Cir.), <u>cert. denied</u>, 502 U.S. 828(1991); <u>Porcaro v.</u>
<u>United States</u>, 784 F.2d 38, 40 (1st Cir. 1986), <u>cert. denied</u>, 479
U.S. 916 (1986); <u>Shraiar v. United States</u>, 736 F.2d 817, 818 (1st
Cir. 1984); <u>Mack v. United States</u>, 635 F.2d 20, 26-27 (1st Cir.
1980); <u>see</u> <u>also</u> Rule 4(b), Rules Governing Section 2255
Proceedings.

**ARGUMENT**

**I.    Garner Failed To Meet His Burden of Establishing That Trial**
**      Counsel Was Ineffective and Actual Prejudice Resulted**

### A.    <u>Strickland Standard</u>

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the
Supreme Court articulated a two-part test to determine whether,
in a particular case, an attorney's performance fell below the
constitutionally required minimum.  First, the performance must
be shown to have been deficient, and second, the deficient
performance must be shown to have prejudiced the defense.  <u>Id.</u> at
686-87.    Thus, "a petitioner must establish both
constitutionally deficient performance on his attorney's part and
concomitant prejudice, or, phrased another way, that the quality
of legal representation at his trial was so inferior as to be
objectively unreasonable, and that this incompetent lawyering
redounded to his substantial detriment." <u>United States v.</u>
<u>McGill</u>, 11 F.3d 223, 226 (1st Cir. 1993)

The First Circuit in <u>Phoenix v. Matesanz</u>, 233 F.3d 77, 81

5

(1st Cir. 2000)  reiterated the <u>Strickland</u> standard:

> First, the defendant must show that counsel's
> performance was deficient.  This requires showing that
> counsel made errors so serious that counsel was not
> functioning as the "counsel" guaranteed the defendant
> by the Sixth Amendment.  Second, the defendant must
> show that the deficient performance prejudiced the
> defense.  This requires showing that counsel's errors
> were so serious as to deprive the defendant of a fair
> trial, a trial whose result is reliable.

<u>Phoenix v. Matesanz</u>, 233 F.3d at 81 (citations omitted).

The habeas petitioner bears the burden of proof, by a
preponderance of the evidence, on both parts of this test. <u>See</u>
<u>Cofske v. United States</u>, 290 F.3d 437, 441 (1st Cir. 2002);
<u>Scarpa v. DuBois</u>, 38 F.3d 1, 8 (1st Cir. 1994).  The test has
been characterized as "highly demanding."  <u>Kimmelman v. Morrison</u>,
477 U.S. 365, 383 (1986); <u>see also</u> <u>Lema v. United States</u>, 987
F.2d 48, 51 (1st Cir. 1993) ("A defendant bears a very heavy
burden on an ineffective assistance claim").  A reviewing court
"must indulge a strong presumption that counsel's conduct falls
within a wide range of reasonable professional assistance; that
is, the defendant must overcome the presumption that, under the
circumstances, the challenged action 'might be considered sound
trial strategy.'"  <u>Strickland</u>, 466 U.S. at 689 (quoting <u>Michel v.</u>
<u>Louisiana</u>, 350 U.S. 91, 100-01 (1955)); <u>Lopez-Nieves v. United</u>
<u>States</u>, 917 F.2d 645, 649 (1st Cir. 1990).  "The benchmark for
judging any claim of ineffectiveness must be whether counsel's
conduct so undermined the proper functioning of the adversarial

process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. at 686. Moreover, in applying the test a court should bear in mind that the Sixth Amendment "does not guarantee a defendant a letter-perfect defense or a successful defense," United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991), but only "a fair trial and a competent attorney," Engle v. Isaac, 456 U.S. 107, 134 (1982). Simply put, "in itself, dreary lawyering does not offend the Constitution." Scarpa, 38 F.3d at 8.

With respect to the petitioner's burden to prove prejudice from the alleged ineffective assistance, it is incumbent upon him to demonstrate a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Phoenix v. Matesanz, 233 F.3d at 81 (quoting Williams v. Taylor, 529 U.S. at 390)).

## B.    Defense Counsel's Representation Substantially Exceeded the Strickland Standard

The defendant has failed to demonstrate by a preponderance of the evidence that counsel was deficient in his representation. To the contrary, the record reflects that from the very outset of this case, defense counsel aggressively and effectively represented the defendant.

Garner's primary complaint is that defense counsel did not adequately cross-examine one of the government's principal witnesses, Boston Police Officer Daniel P. Linskey.  Garner makes this claim despite the fact that his counsel's cross-examination of Officer Linskey was quite extensive and took a good part of Day Two and part of Day Three of the trial.

More specifically, Garner contends that his counsel failed to adequately confront Officer Linskey at trial with an alleged inconsistent statement made by Officer Linskey during a pretrial evidentiary hearing regarding the pagination of a search warrant inventory form.  However, the alleged inconsistency is anything but clear and certainly does not constitute "devastating cross-examination" material as suggested by Garner in his habeas petition.  At the evidentiary hearing in July of 2001, Officer Linskey was part of the following colloquy with defense counsel and the Court regarding the pagination of the search warrant inventory form:

        THE COURT:        Excuse me.  Was the original inventory in
    your file?

        THE WITNESS:    I believe it was, your Honor, yes, ma'am.

    Q.    Where is the original inventory right now?

    A.    I don't know whether it's in my file or the U.S. Attorney's
          file, but ...

        THE COURT:        Do you have your file right here?

        THE WITNESS:    There's two files in there.  I'm sorry --
    Officer Quinn took off the stand something.

8

THE COURT:    Are they your personal file?

THE WITNESS:    It's the case file.  At one point, I gave the U.S. Attorney my entire case file and he had custody of it for a period of time, until he could make Xerox copies.

Q.    Can you tell us why those three forms are different, those three packages are different?

A.    This one has lines on it.

Q.    When you refer to "this one," if you could just refer to it --

A.    The one with the yellow dot?

Q.    That's an exhibit number, does it have?

A.    I don't see an exhibit number on it, sir.  Just a yellow dot on it.

Q.    Well, the one with the yellow dot has Page 1 of 3 and Page 2 of three.  Is that right?

A.    Yes, sir, it does.

Q.    And the one with the green dot has Page 1 of 3 and Page 2 of 2 and Page 1 of 2?

A.    Yes, sir.

Q.    And the original inventory form has one of 3, 2 of 3, and 3 of 3.  Is that correct?

A.    Yes, sir.

Q.    Can you tell us why that last form, the original Exhibit 1, was generated all at the same time, why the other two packages have different numbering?

MR. LaPLANTE:    Objection.  It calls for speculation.  I did the numbering, your Honor.

THE COURT:    If you know.

A.    I don't know.

Q.    Who did the numbering, do you know?  Not the Bates stamp numbering.  I'm saying -- I'm talking about the numbering in the upper right-hand corner?

9

A.    Yes, sir.   It looks like it was initially done and then might have been handwritten over, as if a mistake had been made.

THE COURT:    But you don't know?

THE WITNESS:    I do not know, your Honor.

THE COURT:    Anything else?

MR. GIOIA:    No, your Honor.

[7/16/01 Evid.Hrg.Tr. 3-75 through 3-77]

At trial in December of 2001, the issue of the pagination of the search warrant inventory form again arose.   During direct examination, the following colloquy occurred between Officer Linskey and the prosecutor:

Q.    Did you make any other changes in the document [search warrant inventory form] before you decided to finalize it?

A.    Yes, sir.

Q.    What else did you do?

A.    It appears I renumbered the pages, 1 of 1, 2 of 1--

MR. GIOIA: Strike that word "appears."

THE COURT: Well, do you remember?

Q.    Do you remember what you did?

A.    **I don't remember doing it.** But I can tell that's my handwriting in the corner.

THE COURT: Well, no.   I'll allow that it's his handwriting.

Q.    Judging from the handwriting, can you tell what you did?

A.    Changed the numbers Page 1 of 2, 2 of 2, and 3 of 3.

Q.    Okay.   So that's a three-page document there?

10

A.    Yes, sir.

Q.    And before you made the changes, what did the typewritten page numbers say?

A.    1 of 2, 1 of 2, and 1 of 2.

Q.    So, all three pages said Page 1 of 2?

A.    Correct.

Q.    And you made a correction with your handwriting?

A.    Yes, sir.

Q.    Tell the jury what correction you made.

A.    I put 1 of 3, 2 of 3, and 3 of 3, in the top right-hand corner.

[12/11/01 Trial Tr. 2-118 through 2-119]

The foregoing is hardly a stark, glaring inconsistency which provided "devastating cross-examination" material to defense counsel.  In light of Officer Linskey's admission on direct examination at trial that "I don't remember doing it", his prior testimony during the evidentiary hearing barely qualifies as impeachment material at all.  Additionally, contrary to Garner's assertions in his habeas petition, defense counsel did address this matter again during cross-examination at trial as evidenced by the following colloquy between defense counsel and Officer Linskey:

Q.    The forms that have been marked into evidence were signed by you?

A.    Correct, they have.

11

Q.     Do you know where the original unsigned Page 2 is that you're -- the copy that you're holding in your hand?

A.     No, sir.  My file was forwarded to the U.S. Attorney's Office so that they could make copies of everything for you for the case, and I haven't seen the original since then.

Q.     Do you know where the other pages, 1 and Page 3, would be of that?

A.     Where the Xerox copies of this would be?

Q.     No.  The unsigned copy.

A.     No, sir.  There's various copies of this form, some signed, some aren't signed.

Q.     Well, what are the other ones that are unsigned?  Have you seen anything other than those two pages that are unsigned?

A.     I'm not sure, sir.  There's several copies of this.  And I know there's a copy where one side of the page is one page and then the second, on the back side, there's a -- it looked like a double-sided copy.  So, there was a bunch of Xerox glitches with it.

Q.     Were there any other copies of unsigned inventory forms?

A.     I believe I've answered, sir.  There's a bunch of copies that I'm unsure.

Q.     Now, yesterday, you said with the inventory forms that were signed and marked as an exhibit, you made the changes to the top -- on the top right to the numbers.

A.     Correct, sir.

Q.     But those numbers in the top right of that form that you're holding there have also been changed.

A.     One of them has, sir.

Q.     One of them has.  And it was changed from --

A.     From a -- it looks like from a 1 to a 2.

Q.     So, the first page reads what in the top right?

12

A.   It looks like 1 of 2 with an inked-over 2 in front.  So, it would be 2 of 2.  And the second page says Page 1 of 2.

Q.   Without any handwritten --

A.   Correct, sir.

Q.   -- words?  And those two -- everything else on those pages is exactly the same.

A.   Correct, sir.

Q.   But, there was a change made in the upper right-hand corner of the first page that you have?

A.   Yes, sir.

Q.   And you didn't make that change because you didn't sign that copy.

A.   I believe I did make that change, sir.  It looks like my handwriting.

Q.   But you didn't sign that particular copy, did you?

A.   I didn't sign this copy, yeah, correct.

Q.   So, what indication do you have that you even looked at that piece of paper?

A.   The way I make my 2's.

Q.   Just the way you make a 2?

A.   Yes, sir.

Q.   And, then, the original form was also -- the numbers were changed, but they're not changed in the same way they were changed on that form that you have in front of you, don't you?  Isn't that right?

A.   I don't believe so, sir.

Q.   Well, would you check it, please, for me?

A.   Yes, sir.  Correct, sir.

Q.   So, the changes to the numbers in the original -- well, in

13

the forms that have been marked as an exhibit, the three pages,
those changes are different than the changes in the form that you
have in your hand.  Right?

A.    It appears so, sir, yes.

Q.    And that form you have in your hand is not signed by you?

A.    Correct.

Q.    And you don't know where the original is of that form?

A.    Correct.

[12/12/01 Trial Tr. 3-11 through 3-14]


        Thus, defense counsel certainly brought to the jury's

attention the possibility that there had been some mishandling

of the search warrant inventory form.  Moreover, defense counsel

clearly knew how to confront witnesses with prior inconsistent

statements and, in fact, did so on the third day of trial during

cross-examination of Officer Linskey on another point which was

much clearer and much more effective than the confusion

surrounding the pagination of the search warrant inventory form:

Q.    And, in fact, that day, you wrote an application for a
search warrant?

A.    I did, yes, sir.

Q.    And that was done within hours, probably, after you spoke to
Mr. Garner.

A.    Correct.

Q.    And you did put in your application for a search warrant
about the statement that he gave you?

A.    The statement that there'd be additional cocaine in the

14

plant, yes, sir.

Q.   And there's nothing in that search warrant application about bagged-up cocaine or that he bagged it?

A.   I don't believe I used that adjective, correct.

Q.   And you have that -- you can check now -- that you have that application in front of you?

A.   I have reviewed it.  I didn't use that adjective, correct.

**Q.   And, in fact, you testified previously in a hearing in this case in July of this past year?**

**A.   I've testified on several hearings in this case, yes, sir.**

**Q.   And you were asked what Mr. Garner told you back then, in July of the year 2000?**

**A.   Correct, sir.**

**Q.   And you never used the adjective "bag" or "bagged" at that hearing?**

**A.   In the July hearing, I don't believe I did, sir.  No.**

Thus, as set forth above, defense counsel effectively cross-examined Officer Linskey in a manner he deemed efficient and effective and properly chose the best times to attack Officer Linskey's credibility with prior inconsistent statements. Defense counsel's trial strategy should not now be second guessed on collateral review.


**II.   There Was No Failure to Disclose Favorable Evidence to the Defendant**

Boston Police Officer Daniel Linskey prepared a search

15

warrant application and affidavit in this case which relied in large part upon information from a confidential informant referred to as "Dread". Petitioner Garner, without any documentation or sworn affidavits, contends that this confidential informant was the mother of his child, Ms. Shnell Swain, and that it was improper for the government not to disclose this to him. As evidenced by the Affidavit of Daniel P. Linskey attached hereto as Exhibit A, Ms. Schnell Swain was not the confidential informant referenced in the subject search warrant affidavit and Ms. Swain did not provide Officer Linskey with any information which was in the subject search warrant affidavit.   Accordingly, this argument must be denied.

### III.   The Defendant's Sentence is Not Unconstitutional

Defendant Garner also contends that his sentence is unconstitutional based upon United States v. Booker, 543 U.S. __, 125 S.Ct. 738 (2005). However, Booker's Sixth Amendment holding constitutes a "new constitutional rule of criminal procedure," which, under Teague v. Lane, 489 U.S. 288 (1989), is not retroactively applicable to cases that became final before the decision was announced. The Supreme Court's decision in Schriro v. Summerlin, 124 S. Ct. 2526 (2004), clearly indicates that Booker is a new procedural rule that is not retroactive to cases on collateral review. In Summerlin, the Court considered whether

16

Ring v. Arizona, 536 U.S. 584 (2002), applies retroactively to
cases that had already become final when Ring was decided.  Ring
held that because Arizona law authorized the death penalty only
if an aggravating factor was present, Apprendi v. New Jersey, 530
U.S. 466 (2000) required the existence of such a factor to be
proved to a jury rather than to a judge.  Summerlin's conviction
and death sentence, which was imposed under the same Arizona law
that was at issue in Ring, became final long before Ring was
decided.  The Supreme Court held that "Ring announced a new
procedural rule that does not apply retroactively to cases
already final on direct review."  124 S. Ct. at 2526.  The Court
also held that Ring did not fall within Teague's narrow exception
for "watershed rules" of criminal procedure.  Consistent with the
reasoning of Summerlin, the Sixth Amendment jury-trial holding of
Booker is also not a watershed rule of criminal procedure.

Under Booker and Apprendi, the error in enhancing a
defendant's sentence based on facts found by the judge also
involves a deprivation of the due process right to proof beyond a
reasonable doubt.  Nevertheless, all of the courts of appeals
that have considered the question have held that Apprendi is a
procedural rule that does not fall within the "watershed"
exception in Teague, and that Apprendi claims are therefore not
cognizable on collateral review.  See, e.g., Sepulveda v. United
States, 330 F.3d 55 (1st Cir. 2003); Coleman v. United States,

17

329 F.3d 77 (2d Cir. 2003); United States v. Swinton, 333 F.3d
481 (3d Cir. 2003); United States v. Sanders, 247 F.3d 139 (4th
Cir. 2001); United States v. Brown, 305 F.3d 304 (5th Cir. 2002);
Goode v. United States, 305 F.3d 378 (6th Cir. 2002); Curtis v.
United States, 394 F.3d 841 (7th Cir. 2002); United States v.
Moss, 252 F.3d 993 (8th Cir. 2001); United States v. Sanchez-
Cervantes, 282 F.3d 664 (9th Cir. 2002); United States v. Mora,
293 F.3d 1213 (10th Cir. 2002); McCoy v. United States, 266 F.3d
1245 (11th Cir. 2001). The same is true for Booker challenges to
sentences imposed under the Guidelines.

        If Garner is arguing that Booker is substantive because the
Court's remedial opinion excised the portions of the sentencing
statutes that made the Guidelines mandatory and allowed the
imposition of a "reasonable" sentence below the Guidelines
sentence, it should be clear that the remedial opinion is not
substantive because it does not "alter the range of conduct or
the class of persons that the law punishes." Summerlin, 124 S.
Ct. at 2523 (citing Bousley v. United States, 523 U.S. 614, 620-
621 (1998), and Saffle v. Parks, 494 U.S. 484, 495 (1990)).

        Even assuming arguendo the remedial opinion in Booker is
retroactive as a substantive rule, a claim under that rule is not
cognizable on collateral review. There is simply no fundamental
miscarriage of justice in the imposition of a Guidelines
sentence, which is not an unreasonable sentence, and the

deprivation of additional judicial discretion to impose a
reasonable sentence other than the Guidelines sentence is not
fundamentally unfair.  See <u>United States v. Timmreck</u>, 441 U.S.
780, 783 (1979); <u>Hill v. United States</u>, 368 U.S. 424, 428
(1962).[2]

Finally, defendant Garner has failed to show both "cause"
for his failure to raise the issue at trial and on direct appeal,
and "actual prejudice" resulting from the <u>Booker</u> error.  See
<u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998); <u>United States</u>
<u>v. Frady</u>, 456 U.S. 152 (1982).  As to "cause," even though prior
to <u>Blakely</u> every court of appeals had rejected challenges to the
Sentencing Guidelines under <u>Apprendi</u>, see <u>Blakely</u>, 124 S. Ct. at
2547 n.1 (O'Connor, J., dissenting)(citing cases), "the futility
of presenting an objection *** cannot alone constitute cause for
a failure to object at trial." <u>Engle v. Isaac</u>, 456 U.S. 107, 130
(1982); see <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998).

Garner has also failed to show "actual prejudice," <u>i.e.</u>,
that the error "worked to his <u>actual</u> and substantial
disadvantage." <u>Frady</u>, 456 U.S. at 170.  This is a demanding
standard which Garner has not met; it requires the defendant to

---

[2] Moreover, even if this case was still on direct appeal
(which it is not), Garner's <u>Booker</u> claims would fail because he
cannot "point to circumstances creating a reasonable probability
that the district court would impose a different sentence more
favorable to the defendant under the new 'advisory Guidelines'
Booker regime." <u>United States v. Antonakopoulos</u>,__F.3rd__,
Slip.Op.No. 03-1384 (1st Cir.)(February 22, 2005).

carry a burden "significantly higher" than he would be required to satisfy on direct review under the plain-error standard.  <u>Id.</u> at 167. As evidenced by the sentencing hearing conducted on April 1, 2002, Garner received a far more lenient sentence (270 months) than what was indicated by the applicable guideline sentencing range (420 months to life).  A true and correct copy of the transcript of that sentencing hearing is attached hereto as Exhibit B.

**CONCLUSION**

For the reasons set forth above, the government requests that the defendant's habeas petition pursuant to 28 U.S.C. § 2255 be denied without a hearing.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Date: March 2, 2005           By:  _____
                                   Brian T. Kelly
                                   Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

        I hereby certify that I caused a copy of the foregoing pleading to be served on the petitioner, Shawn L. Garner,  at FCI-Oakdale, P.O. Box 5050, Oakdale, LA, 71463 by first class mail on March 2, 2005.

_____
Brian T. Kelly
Assistant U.S. Attorney

## AFFIDAVIT OF DANIEL P. LINSKEY

I, Daniel P. Linskey, being duly sworn, depose and say:

1.  I am a Sergeant Detective with the Boston Police Department.  I am currently the Commander of the Special Police Division of the Boston Police Department.  I have been a Boston Police Officer for more than 18 years.

2.  I was one of the officers involved in the arrest of Shawn Garner in July of 2000.

3.  I prepared the search warrant affidavit which is, in part, the subject of Mr. Garner's recent habeas petition pursuant to 28 U.S.C. §2255.

4.  Contrary to Mr. Garner's unsworn assertions in his recent habeas petition, Ms. Schnell Swain was not the confidential informant referenced in the subject search warrant affidavit. Ms. Swain did not provide me with any information which was in the subject search warrant affidavit.


Daniel P. Linskey
Sergeant Detective
Boston Police Department


NOTARY PUBLIC
My Commission Expires 27 March 2009

Subscribed and sworn to before me,
this _16_ day of _February_ 2005.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

---------------------------------
UNITED STATES OF AMERICA     :     Criminal
                           :     No. 00-10392-PBS
                           :
          V.                :     Courtroom No. 13
                           :     1 Courthouse Way
                           :     Boston, MA 02210-3002
SHAWN GARNER             :     4:00 p.m., Monday
---------------------------------       April 1, 2002

Sentencing Hearing

Before:      THE HONORABLE PATTI B. SARIS,
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

Brian T. Kelly, Asistant United States Attorneys,
   John Joseph Moakley Courthouse - Suite 9200,
   1 Courthouse Way, Boston, MA 02210-3002,
   on behalf of the Government.

Randy Gioia, Esquire,
   24 School Street, Boston, MA 02108,
   on behalf of the Defendant.

Marie L. Cloonan
Official Court Reporter
1 Courthouse Way - Suite 5209
Boston, MA 02210-3002 - (617)439-7086
Mechanical Steno - Transcript by Computer

2

1          THE CLERK:  The case of the United States v. Shawn

2    Garner, Criminal Action No. 00-10392, will now be heard

3    before this Court.

4          Will counsel and Probation please identify

5    themselves for the record.

6          MR. KELLY:  Good afternoon.

7          Brian Kelly for the United States.  Mr. LaPlante

8    was unable to make it.

9          MR. GIOIA:  Good afternoon, your Honor.

10          Randy Gioia representing Mr. Garner, who is present

11    in Court.

12          THE PROBATION OFFICER:  Your Honor, Joshua Ulrich

13    for Probation.

14          THE COURT:  All right.

15          It strikes me that the guideline range is not

16    disputed, but the Motion for a Downward Departure is very

17    much disputed.  So, at least to set the record as to what

18    the guidelines provide, I understand basically there's

19    agreement that it's 420 months to life.

20          And there's been a motion for a downward departure.

21    That's a Total Offense Level 37, Criminal History Category

22    of 6 and there's a five-year on and after for the gun

23    charge.  $20,000 to $4 million fine and a $300 special

24    assessment.

25          I forget what the supervised release is.  It's not

3

1   written in.  Do you remember what the supervised release is?

2           THE PROBATION OFFICER:  No.

3           THE COURT:  I'm sure I could get it.

4           THE PROBATION OFFICER:  Five years on and after.

5           THE COURT:  Five years.

6           So, the difficult question here is what to do about

7   the Motion for a Downward Departure.  As the government

8   recognizes, I have the discretion to do it.

9           And I was wondering, Mr. Gioia, how you were going

10  to go about demonstrating that the criminal history

11  substantially overstates the seriousness of his record.

12  Were you planning on introducing witnesses?

13          MR. GIOIA:  Well, I wasn't sure about that, your

14  Honor, to tell you the truth.  I know that we had this

15  hearing scheduled for 4:00 p.m.  I was not intending to

16  bring any witnesses into Court today.

17          THE COURT:  Well --

18          MR. GIOIA:  No, go ahead.

19          THE COURT:  There's one offense that's clearly very

20  serious, just hands down, the Essex Superior Court one, the

21  armed assault.

22          MR. GIOIA:  I'm not even --

23          THE COURT:  So, you're not even touching that.

24          MR. GIOIA:  -- really arguing that.  I think we

25  could fairly put that aside.

4

```
 1            THE COURT:  Okay.

 2            So, then, we have the other one that the government

 3    -- excuse me -- that Probation mentioned, which is

 4    an assault and battery with a blunt weapon, which the

 5    Probation Department was awaiting police reports on and I

 6    don't think we have yet.

 7            MR. GIOIA:  That's the 1999.  Now, of course, that

 8    is not an assault and battery by means of a dangerous

 9    weapon.

10            THE COURT:  I understand that.  But, the issue that

11    I have is I'm not willing to just take your proffer on it.

12    I don't have police reports, I don't have witness

13    statements, I have no live testimony.

14            But, since that was the other one that the

15    Probation Department relied on -- and I didn't get any

16    objections -- I mean, I guess those are the two out there, I

17    can't just rest on a say-so in a memo.

18            So, do you have witnesses you'd want to put on on

19    that case?

20            MR. GIOIA:  Yeah.

21            THE COURT:  What do you think?  He received

22    basically time served for it, which we couldn't quite figure

23    out what it was.  But, it was a category --

24            MR. GIOIA:  Thirty-two days, I think it was.

25    Wasn't it?  I thought I had put that ...
```

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

5

1     THE COURT:  It said time served.  It looks as if he
2 was arrested on November 17th, 1999, or at least arraigned
3 on that day, and, then, that he pled guilty, maybe, on March
4 9th?

5     MR. GIOIA:  Yes.

6     THE COURT:  And so, it says the 32 days, but, then,
7 it also says time served.  So, it wasn't a hundred percent
8 clear to me whether he was just arraigned and then at some
9 point picked up?  I wasn't sure.

10     Do you know what it means?

11     THE PROBATION OFFICER:  It wasn't entirely clear to
12 me, your Honor.  I have the docket, if you'd like to take a
13 look at it.

14     THE COURT:  We might do that.  But, before I get to
15 that, whether it's 32 days or four months, it's not a
16 serious sentence.  But, I'm not prepared to go just on this
17 minimal description in Paragraph 68 as to whether it was or
18 wasn't serious.  I just don't know.

19     Do you know more about it, Mr. Kelly?

20     MR. KELLY:  No, your Honor.

21     The only thing I would point out is that, as stated
22 in the defendant's Motion for Downward Departure on Page 2,
23 there are really three predicates giving rise to the career
24 offender characterization.  That would be the '91 conviction
25 set forth in Paragraph 63, the '93 conviction set forth in

6

1    Paragraph 66, and the '99 conviction set forth in Paragraph

2    68.    That's what the defendant says in his brief.    We

3    believe the same is true.

4            However, when I double-checked --

5            THE COURT:    You didn't object.

6            MR. KELLY:    I know.    I didn't.    But, when I

7    double-check the PSR, I only see two listed.    They did not

8    include the '93 conviction.

9            And, I think under a First Circuit case called

10   Mangos, M-a-n-g-o-s, that's an assault and battery.    It

11   counts.    So, there's really -- if the Court's going to knock

12   out the career offender classification, it has to do so with

13   respect to two out of the three.

14           THE COURT:    So, let me put it this way.    As far as

15   I read, just to make sure, no one objected.    So, you're now

16   trying to assert a late objection.    Is that basically what

17   you're doing?

18           MR. KELLY:    Yes, it is untimely.

19           And I just think as a legal matter, that one does

20   count and it was -- I can't say -- well, the defense agreed

21   with that in its submission.    So --

22           THE COURT:    Maybe you both didn't notice it wasn't

23   listed.    But, it wasn't.    I went back and looked, it just

24   wasn't there.    So, maybe you both are agreeing it should be

25   part of the case.    But, it's -- when I looked, it wasn't

FORM CSR - LASER    REPORTERS PAPER & MFG. CO.    800-626-6313

7

1   there.

2          MR. GIOIA:  You mean it wasn't something that

3   Probation --

4          THE COURT:  It wasn't something Probation relied on

5   and I didn't get objections.  So --

6          MR. GIOIA:  Right.  I understand that.  And I'm

7   certainly not objecting to them.  And I think that they have

8   in my conversations with Probation, with Mr. Ulrich, I think

9   they have a very rational, reasonable -- they have a good

10  reason for not including that as a predicate.

11         THE COURT:  Well, let me put that aside for a

12  minute.  Would you want to be introducing witnesses on both

13  of them?

14         MR. GIOIA:  I certainly have, I think, your Honor,

15  on the 1999 conviction, the one that you're focusing in on,

16  I think we could probably introduce -- I think if the Court

17  knew all the facts of that, I think a reasonable conclusion

18  would be that there are mitigating circumstances which

19  reduce the seriousness of that offense and I think that that

20  is a proper consideration when you're deciding whether or

21  not the career offender designation --

22         THE COURT:  Is the person here now?

23         MR. GIOIA:  No.

24         THE COURT:  Do you want to --

25         MR. GIOIA:  I would need more time to do that, your

8

1    Honor.  I think there is a witness here now, but I would not

2    be prepared to go forward on that.  There's probably -- I

3    would have at least two witnesses that I can think of off

4    the top of my head that I would want to bring in.

5           THE COURT:  The other issue is with respect to the

6    domestic abuse.

7           MR. GIOIA:  Right.

8           THE COURT:  Were you going to introduce evidence on

9    that?  That's one in which they have police reports.

10          MR. GIOIA:  But, again, when you look at those

11    police reports, look at what he was charged with in that

12    case.  The police reports correspond to the charges.  But,

13    then, when you look at the result, then, and it's basically

14    just an assault and battery.

15          THE COURT:  Let me turn to the government on one

16    thing here.  I have to say I'm always the last to know what

17    the sentencing range is likely to be.  And, I have to tell

18    you, I've been taken aback by the sentencing range.  As

19    serious an offense as this was and as terrible a criminal

20    history -- I mean, he just has a terrible criminal record --

21    in some ways he's what Congress anticipated -- it struck me

22    that 35 years is a long time.

23          So, I'm looking to you, really, in a sense, of how

24    much you care.  Because, I know, at one point, you were

25    willing to enter into some plea, which I thought was

FORM CSR - LASER REPORTERS PAPER & MFG. CO.  800-626-6313

9

1    inconsistent with the evidence -- and I still strongly

2    believe -- but it was something that at least the government

3    had some flexibility on.

4            MR. KELLY:  Well, your Honor --

5            THE COURT:  In other words, I can postpone this and

6    do a full evidentiary hearing.

7            MR. KELLY:  Well, obviously, as the Court well

8    knows, it's not the executive branch of government that

9    makes these penalties, it's Congress.  So, it's not the

10   U. S. Attorney's Office that made up these penalties.

11           Now, the penalty is extraordinary.  I don't dispute

12   that.  I looked at the sentencing report and was slightly

13   taken aback myself.  But, then, I looked at his criminal

14   history and, it is atrocious and he's brought it upon

15   himself.

16           Now, if the Court is asking me what --

17           THE COURT:  I'm going to continue this if that's

18   what defense is requesting, to have an evidentiary hearing

19   on the facts underpinning --

20           MR. KELLY:  I think the Court can make its decision

21   whichever way it deems appropriate on this issue.  I don't

22   think I am going to be urging the Department of Justice to

23   make a sentencing appeal on that issue.

24           So, that would be my recommendation.  Basically, we

25   don't care that much.  A 300-month sentence is certainly

10

1    severe punishment, if that's what the Court thinks is

2    appropriate.  That's certainly in the mid range of the

3    alternative range that he's recommending.

4         If the Court doesn't believe he's a career offender

5    based upon what the Court has before it, instead, wants to

6    sentence him within the secondary range, I think a 300-month

7    sentence would certainly provide enough punishment and deter

8    him in the future.

9         So, if that's what the Court's looking for in terms

10   of an appellate analysis from the government, it's up to the

11   Court.

12        THE COURT:  Yeah.

13        I don't want you to put you on the spot.  You're

14   only doing -- I think it took me aback.  You weren't

15   involved in this case from the get-go, so maybe it took you

16   aback.  I'm sure it didn't take Mr. Gioia aback.  I'm sure

17   he probably knew right away, you know, what kind of ranges

18   he was facing.  But, it did me, and it struck me that the

19   alternative range captured how serious the offense was

20   without being so draconian.

21        But, if you -- I don't want to put you in a bind.

22   Do you want to go talk to your people?  Because, I can

23   either just do it right in the alternative range ...

24        MR. GIOIA:  Well, your Honor, I mean, maybe this is

25   beside the point, but, I think the other argument that I

11

1    made on the issues of the seriousness where his status as

2    just a Massachusetts offender affects the guidelines.  If he

3    was in Rhode Island and we were holding court in Rhode

4    Island, he would not be a career offender.

5         THE COURT:  You know what?  That one wasn't so

6    persuasive to me.  But, what is persuasive to me is you made

7    a proffer about the underpinning facts of the one predicate

8    offense that's fairly before me today which, given the fact

9    he either got 32 days or four months.  I don't know.  It

10   struck me it would overrepresent the seriousness of his

11   criminal history category.

12        Now, if we put it off, then, there's no unfair

13   prejudice.  I suppose I would consider the domestic abuse

14   piece of it, too.  Today, all I had in front of me was

15   actually the one that Probation relied on.  I don't want to

16   put it off for an evidentiary hearing if the government's

17   essentially willing to take the proffer and have him do what

18   I'm going to do.

19        MR. KELLY:  The Court should do what it wants to

20   do.  I don't think there's a need for further evidentiary

21   hearings.  The Court knows the facts of the case.  The

22   government is not going to in any way concede that he has a

23   minor criminal history.

24        THE COURT:  I don't think so either.  You couldn't.

25        MR. KELLY:  Right.

1          THE COURT:  You couldn't.

2          MR. KELLY:  And I think he should get not the low

3     end of the second guideline range.  So, I think the Court

4     should go forward today.  I don't think -- he's 29 years

5     old.  I think a 300-month sentence would certainly be

6     sufficient in this case.

7          So, I don't see a need to pursue this with

8     additional evidentiary hearings.  But, just for the record,

9     this distinction about him being from Massachusetts, it

10    doesn't wash.  He probably got those plea bargains in the

11    state system --

12         THE COURT:  Don't go there, having been a member of

13    the state system.  But ...

14         MR. KELLY:  So, now, he can't capitalize on the

15    leniency of those plea bargains here.

16         THE COURT:  All right.  I'm not going there.

17         But what I am taking, at least, because the

18    government -- and I appreciate it and thank you for it, at

19    least not pressing for an evidentiary hearing.  I'll take

20    the proffer.  I'll take the proffer.

21         I'm a little worried about taking a proffer

22    generally because you just don't know particularly in the

23    domestic abuse situation.  On the other hand -- I forget

24    what she -- what did she get on that?

25         MR. GIOIA:  On the other case?

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

13

1     THE COURT:  Yes.  It was --

2     MR. GIOIA:  The domestic violence case, Judge?

3     THE COURT:  Yes.  Thirty days, I think.

4     MR. GIOIA:  Thirty days, but, then, there was a --

5     THE COURT:  Revocation?

6     MR. GIOIA:  -- Probation surrender.  But, the

7 original sentence was 30 days.

8     THE COURT:  All right.

9     I'm going to the alternative range.  So, you want

10 three --

11     Do you want to say anything else other than the

12 300?

13     MR. KELLY:  Well, yes, I do, your Honor.  And I

14 would strongly urge the Court to impose that sentence.

15 Because, as it is, that's a ten-year break the Court has

16 just given the defendant --

17     THE COURT:  That's right.

18     MR. KELLY:  Three hundred versus four twenty.  It's

19 a huge break.

20     The government in this case -- although I wasn't

21 involved in it -- offered the defendant an eminently

22 reasonable plea bargain.  He chose not to take it.

23     The facts of the case indicate he's a crack cocaine

24 dealer and he has been involved in a lot of violence,

25 drug-related activity, for the past decade.

FORM CSR - LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

14

1       Mr. Gioia, no doubt, will point out his many family
2  members who are here today and that is to his credit.  But,
3  I think the Court should think about the family members, the
4  parents and the kids of people who aren't here, the people
5  whose lives have been destroyed by the crack cocaine that he
6  chose to peddle in his own neighborhood.  He did this
7  repeatedly.  This is not a first-time offender.  So, we're
8  thinking severe punishment is warranted and we think a
9  300-month sentence would satisfy all the goals of the
10 criminal justice system.
11      THE COURT:  Thank you.
12      Mr. Gioia?
13      MR. GIOIA:  Your Honor --
14      THE COURT:  So, we're going to the alternative
15 range.
16      MR. GIOIA:  I'm in the alternative range.  I'm
17 there.  And I think 270 months is a staggering sentence,
18 your Honor, for this man, who is 29 years old.  He's going
19 to be in the state prison for 200 -- well, when you take out
20 the 85 percent, it's still a significant sentence of close
21 to 20 years.
22      And he does -- I think it is important to see the
23 family that is here and that has been here throughout the
24 trial for Mr. Garner, your Honor, and especially, as the
25 Court well knows, that he does have his nine-year-old son

15

1    who, unfortunately, played somewhat of an important role in

2    this case.  And, I think it's significant that Mr. Garner

3    and his son need to somehow deal with the significant period

4    of time he's going to be incarcerated in a very important

5    way.  Because, I think, in some ways, the son is facing a

6    situation where he may at some point feel some

7    responsibility for what happened in this case and I think

8    that that's a very significant issue, not only for this

9    young boy, but for Mr. Garner.  And he also has a

10   two-year-old son.

11          So, he does have these children who are not going

12   to have their father for -- essentially, for their entire

13   childhood.

14          And, I think, your Honor, when you're talking 270

15   months or 300 months, 270 months, I think, is more than

16   enough to satisfy the goals of the criminal justice system

17   to punish him for what he did and for what his criminal

18   record is all about and, to deter his conduct in the future,

19   I think, after you serve that amount of time, when he gets

20   out, I think there's a low, low likelihood of recidivism.

21   And I think what the Court will also take into consideration

22   is giving him that much less time to be able to come back

23   into the community and have some relationship with his

24   children, which I think is most important in this particular

25   case, your Honor.

16

1      THE COURT:  Do you want to say anything, Mr.
2  Garner?
3      THE DEFENDANT:  Can I stand?
4      MR. GIOIA:  Yes.
5      THE DEFENDANT:  Thank you.
6      Well, your Honor, just, first of all, I wanted to
7  thank my family, you know, for supporting me and -- you
8  know, financially, emotionally and everything through this
9  whole trial.
10     But, as you know, there's a lot of things that went
11 unnoticed in my trial that, even though I tried to bring to
12 you and to the government, but it went upon deaf ears.  You
13 know?  So, what can I say?
14     I accept my punishment that you're going to give to
15 me.  And, you know, I thank the government for, you know,
16 allowing you to go the mid range of the 300 months.  And,
17 you know, like they say, God puts nothing upon no man that
18 he can't bear.  So, whatever sentence you hand on me today,
19 I know, you know, I have to do it.  And, you know, that's
20 ...
21     THE COURT:  Well, let me just say this.  Put aside
22 for a minute the instant offense, because I know you're
23 challenging that.
24     THE DEFENDANT:  Right.
25     THE COURT:  You said you were innocent of that and

17

1    I'll leave that alone for a minute.

2          You've got a terrible criminal history record.

3          THE DEFENDANT:  I understand that, your Honor.  But

4    --

5          THE COURT:  Lots of guns and lots of violence.

6    It's just lucky for you, actually, that two of the charges

7    were reduced to simple A and Bs with low sentences.

8    Because, with a record like yours, the next time there is

9    ever a conviction like this, I think someone is going to

10   throw away the key.

11         So, I mean, the question is:  What is going to make

12   -- maybe it's having children makes you turn around about

13   what your lifestyle is all about.  But, it's really a bad

14   record.

15         THE DEFENDANT:  I agree with you, that it's a bad

16   record, you know.  The same token, I was young at the time.

17   You know?  And somebody come to you and say, "Well, take 30

18   days, and get out of jail," who's going to do it?  You know?

19   It's not saying that I pled guilty because I was guilty.

20   You know, you have alternatives.  You stay in jail and wait

21   for trial or take 30 days and go home.  That's what it

22   played out to be.  And that's what made my record look as it

23   does today.  Because, I done that so many times.

24         I'm not saying that, you know, I didn't get in

25   trouble, because I did.  The things that I was charged for,

18

1   I did.  And I pled guilty to them.

2           But, you know, this five years is, I don't know.

3   But, I'll accept, you know, whatever you give my today.

4           THE COURT:  All right.

5           As I said, actually, for all the criticisms of the

6   guidelines, there aren't that many cases I have where I'm

7   taken aback and very upset with the sentence I'm required to

8   give.  And that's my original reaction to the 420 months.  I

9   thought that as serious as the criminal background was, that

10  this crime and that background did not merit that long a

11  sentence.  And I, therefore, am appreciative to Mr. Gioia

12  for bringing it to my attention and making the proffers and

13  to the government for taking what I think is a very

14  reasonable position, given this case and this crime.

15          That having been said, I'll say I'm going to

16  sentence to 270 months which is basically halfway in between

17  what both people have asked for.

18          What I was waiting -- I don't have a sense, Mr.

19  Garner, of somebody with such -- put apart for a minute

20  whether the guns and drugs were yours or not in the

21  basement.  The drugs were yours upstairs, because you said

22  they were.  And, even apart from this crime, there's just

23  been a long history of this gun, this violence, and this

24  problem, and you're actually the exact person who Congress

25  had in mind.  And, unless you turn yourself around, not only

FORM CSR-LASER  REPORTERS PAPER & MFG. CO.  800-626-6313

19

1    are you a risk to society, but your babies are never going

2    to see you.

3              And so, I don't have that sense of taking personal

4    responsibility for a very bad lifestyle. And, hopefully,

5    that little boy, Shawnee, of yours, who sounds adorable --

6    thank God, he didn't kill himself or someone else. Thank

7    God. I mean, he sounds like a wonderful little boy.

8              And I read about him threatening to hurt himself,

9    because he's the one who sort of at least factually

10   precipitated all of this. I hope he realizes that I had him

11   in mind when I went down. And I want his family to tell him

12   that. That I understood that and he shouldn't blame

13   himself. And I hope you pass that on to that little boy.

14             But, it's still a pretty serious set of crimes.

15   And it's just pure luck, really, that he didn't shoot  --

16   who's the other little boy?  Mook?

17             MR. GIOIA:  Mookie.

18             THE COURT:  Mookie. Or that someone didn't get

19   hurt in one of these drug transactions.

20             So, what I'm going to do is sentence to, as I said

21   before -- it turns out to be 22 and a half years, 270

22   months. And I'm going to do the full range of supervised

23   release, which is, I think, 60 months. No fine, because, I

24   think at that point it's pretty hopeless, and on special --

25   you won't be able to do it -- And special assessment of

20

1    $300.

2          When he gets out -- was there a drug problem?  Did

3    you recommend that?

4          THE PROBATION OFFICER:  He didn't want to talk

5    about it.  There was a little bit of allusion to it in some

6    prison records I looked through, but I didn't get any

7    information --

8          THE COURT:  Well, why don't I just say drug testing

9    and appropriate treatment.  And you can see how that . . .

10         Is that little boy's mother here right now, Mr.

11   Gioia?

12         Is that the grandmother?

13         MR. GIOIA:  The grandmother is here, and Mr.

14   Garner's mother is here, but the mother of Shawn Garner,

15   Shawnee, is not here, your Honor.

16         THE COURT:  If you could just please pass on that

17   he is not to blame himself and I had him in mind when I was

18   doing this.

19         THE DEFENDANT:  Thank you, your Honor.

20         THE COURT:  Mr. Alba.

21         THE CLERK:  Defendant please stand.

22         Mr. Shawn Garner, the Court hereby notifies you of

23   your right to appeal this sentence.  If you cannot afford

24   the cost of an appeal, you you may move to proceed informa

25   pauperis.  If you cannot afford counsel for an appeal, one

1    will be appointed for you.

2            You're also notified that the clerk of court will

3    fill an appeal on your behalf if requested by you to do so.

4    Any appeal from the sentence must be filed within then days

5    of entry of judgement on the docket.

6            Do you understand these rights?

7            THE DEFENDANT:  Yes.

8            THE CLERK:  Thank you.

9            THE COURT:  Thank you to Probation, once again.

10    Thank you to everyone involved in a very difficult case.

11            MR. GIOIA:  Thank you, Judge.

12            THE CLERK:  All rise.

13            MR. KELLY:  One moment, your Honor.  I think, as a

14    proposal matter, the Court has to decline an objection on

15    the one bullet.  I don't know if the Court has entered

16    an order on that one.

17            THE COURT:  Oh, gee.  You're right.  Thank you,

18    thank you.

19            Yes, I'm granting judgment of acquittal on the one

20    bullet and I'm going to write an opinion on that.  It took

21    me awhile because I had to get the transcript.  And you've

22    already argued it.  So, you'll get the written reasons for

23    it.

24            Thank you.

25            MR. GIOIA:  Thank you, Judge.

FORM CSR - LASER   REPORTERS PAPER & MFG. CO.   800-626-6313

22

1          (Whereupon the hearing was concluded.)

2

3

4

5

6

7                          CERTIFICATE

8

9       I, Marie L. Cloonan, Official Reporter of the

10   United States District Court, do hereby certify that

11   the foregoing transcript, from Page 1 to Page 21,

12   constitutes to the best of my skill and ability a true

13   and accurate transcription of my stenotype notes taken

14   in the matter of Criminal No. 00-10392, United States

15   of America vs. Shawn Garner.

16

17   ---------------------------------------

18

19

20

21

22

23

24

25